UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Teodoso Serrano Moreno,<br><br>                Plaintiff,<br><br>v.<br><br>Michael Astrue, Commissioner of Social Security Administration,<br><br>                Defendant. | Civil No. 08cv1022 WQH (PCL)<br><br>REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE RE:<br><br>DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Doc. 12];<br><br>and<br><br>GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. 15]. |

      Plaintiff Teodoso Serrano Moreno seeks judicial review of Defendant Social Security Commissioner Michael J. Astrue's determination that he is not entitled to Supplemental Security Income disability benefits under Title XVI of the Social Security Act. Plaintiff has filed a Motion for Summary Judgment [doc. 12] and Defendant has filed a Cross-Motion for Summary Judgment [doc. 15]. Responses have also been filed. [Docs. 18 and 19.] For the reasons set forth below, the Court recommends that Plaintiff's motion be DENIED, that Defendant's motion be GRANTED, and that the ALJ's decision be affirmed.

///

///

///

**I. PROCEDURAL HISTORY**

Plaintiff applied for Title XVI Supplemental Security Income benefits on November 28, 2005, alleging an onset date of disability of October 1, 2005 due to mental illness. (A.R. 13.) The claim was denied initially on March 28, 2006 and, upon reconsideration, on December 4, 2006. (A.R. 13.) Thereafter, Plaintiff filed a timely written request for hearing on December 28, 2006. (A.R. 13.) Plaintiff appeared and testified at a hearing held on April 24, 2007 in San Diego, California before Administrative Law Judge (ALJ) Eve Godfrey. (A.R. 13.) Also appearing and testifying were Sidney Bolter, M.D., an impartial medical expert; Mark Remas, an impartial vocational expert; and Flerida Hernandez, the sister of the Plaintiff.

After considering the evidence, Judge Godfrey concluded the following: 1) that there was no evidence that Plaintiff has engaged in substantial gainful activity since November 28, 2005; 2) that Plaintiff had a severe impairment, psychosis; 3) that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1; 4) that Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but is limited to simple repetitive tasks involving minimum contact with others and public contact; 5) that Plaintiff is unable to perform any past relevant work; 6) that Plaintiff was a younger individual age 18-49 under the rules; 7) that Plaintiff had a marginal education and is able to communicate in English; 8) that transferability of skills is not material to his case; 9) that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform; 10) that Plaintiff was not living in the United States on the alleged onset date; and 11) that Plaintiff was not disabled within the meaning of the Social Security Act during the petitioned period. (A.R. 13-23.)

Plaintiff requested a review of the ALJ's decision; the Appeals Counsel for the Social Security Administration denied Plaintiff's request for review on April 7, 2008. (A.R. 4-7.) Plaintiff reapplied for Social Security Income benefits on October 30, 2007, and his application was approved on April 2, 2008. (Doc. 12-2, at 6-7.) Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) for a closed period of benefits not received between November 28, 2005 and October 30, 2007.

**II. ADMINISTRATIVE RECORD**

    A. Medical Evidence

    1. Treating Physicians

The record indicates that Plaintiff sought medication and financial help at the South Bay Guidance Center in November 2005. (A.R. 187-193.) The mental status exam showed that Plaintiff was alert, clean, well-nourished, coherent but had pressured and slowed speech, agitated behavior, flat affect, poor vocabulary, poor abstraction, poor recent memory, poor remote memory, uncertain judgment, repetitive motions, and poor insight. (A.R. 191.) He also had abused alcohol and cocaine recently. (A.R. 191.) He was diagnosed with a severe impairment of psychosis, not otherwise specified, and alcohol dependence in sustained full remission. (A.R. 192.) He was referred to Dr. Bucardo for treatment. (A.R. 192.)

On January 5, 2006, Dr. Bucardo, a psychiatrist, examined Plaintiff, noting that he was attentive; spoke clearly; had good insight with a linear thought process; was intact with reality; and had no hallucinations or delusions. (A.R. 186.) Plaintiff complained of agitation, insomnia, palpitations, aggressive impulses, and depression. (A.R. 186.) Plaintiff had a global functioning scale score of 55. (A.R. 186.) He was prescribed Haldol, Akineton, and Risperdal. (A.R. 187.) He was again seen by Dr. Bucardo on February 2, 2006. (A.R. 183.) Dr. Bucardo noted that Plaintiff recently had visited a local hospital where a physician discontinued Plaintiff's use of Risperdal and gave him Ativan for anxiety. (A.R. 183; see A.R. 130-31.) Dr. Bucardo described Plaintiff as follows: he was cooperative, in good spirits, and nervous; he had good eye contact and speech; his thought process was linear; and he had no hallucinations or delusions. (A.R. 183.) Dr. Bucardo ordered that Plaintiff discontinue using Risperdal; start using Seroquel; continue using Haldol; start using Vistaril; increase the dosage of Akineton; and not use Ativan. (A.R. 183.) Dr. Bucardo recommended against employment during the time of his medication switch to an atypical antipsychotic. (A.R. 182.) Two days later, Plaintiff's family brought him to the Emergency Psychiatric Unit, where staff psychiatrist Mary Ann Renzi examined him. (A.R. 133-135.) She noted that Plaintiff's chief complaint was abdominal pain and that he sought Ativan, an addictive substance that had been previously prescribed to him two weeks ago for a trial run but

1  that Dr. Bucardo would not re-prescribe. (A.R. 133.)   At one point, Dr. Renzi observed him
2  rolling on the floor demanding more Ativan, but could not give a psychiatric reason why he
3  should be given it. (A.R. 133.) Dr. Renzi also noted that although Plaintiff complained of
4  abdominal pain, he did not exhibit any actionable signs of pain when pressure was applied to his
5  abdomen. (A.R. 133.) Describing him as drug seeking, Dr. Renzi told Plaintiff that any changes
6  to his medical treatment would need to be through his outpatient psychiatrist. (A.R. 135.)
7         On March 10, 2006, Dr. Bucardo again examined Plaintiff and noted that he did not
8  tolerate Seroquel and only occasionally took Vistaril and not at the prescribed dosage. (A.R. 181.)
9  Plaintiff was prescribed Haldol, Akineton, and Vistaril to be taken in regular daily dosages. (A.R.
10 181.) Plaintiff was again seen for a scheduled follow-up on May 5, 2006. (A.R. 178.) Dr.
11 Bucardo noted that Plaintiff became depressed and distraught over the news that he was denied
12 Social Security Income benefits and that he sought crisis intervention by phone twice and during a
13 walk-in session once in April 2006. (A.R. 178.) Dr. Bucardo noted that Plaintiff had several
14 episodes with severe psychosis and social withdrawal. (A.R. 178.) Dr. Bucardo noted one
15 occasion where Plaintiff fled to the mountains of Mexico and his family had to search for him to
16 bring him back to civilization. (A.R. 178.) Dr. Bucardo altered Plaintiff's prescription as follows:
17 he added Lexapro for Plaintiff's depression, substituted the medication Artane for the Akineton,
18 and maintained the dosages of Haldol and Vistaril. (A.R. 178-79.) At a June 2006 checkup, Dr.
19 Bucardo noted that Plaintiff remained depressed and reclusive, and he increased the dosage of
20 Haldol and maintained the dosages of the other medications. (A.R. 175.)
21         At the next scheduled follow-up on August 18, 2006, Plaintiff reported improvement in
22 mood and thought, was not reclusive or isolating, and denied paranoia or flashbacks. (A.R. 171.)
23 His sister also reported noticeable improvement, but explained that he ate sparingly and has not
24 tended to his hygiene in the past two weeks. (A.R. 171.) Dr. Bucardo noted that Plaintiff was less
25 guarded but had poor eye contact, and his speech was soft with increased latency but clear and
26 coherent. (A.R. 171.) Dr. Bucardo increased the dosage of Haldol and maintained the dosages of
27 the other medications. (A.R. 171.)
28         On December 4, 2006, Plaintiff sought treatment at the San Diego County Psychiatric

1    Hospital for hearing voices.  (A.R. 204.)  The examining physician Dr. Conte noted found no
2    functional limitations from a psychiatric standpoint.  (A.R. 204.)  On December 8, 2006, Plaintiff
3    appeared for a checkup with Dr. Bucardo, who noted that Plaintiff had another exacerbation of
4    psychotic symptoms while on a trip to Sinaloa.  (A.R. 212.)  Plaintiff's sister explained to Dr.
5    Bucardo that he was partially compliant with his medications, experienced anxiety, and was
6    unable to obtain/maintain employment.  (A.R. 212.)  Dr. Bucardo noted that Plaintiff was clear
7    and coherent, was less guarded, but said he suffered paranoid ideation and voices.  (A.R. 212.)
8    His prescription stayed the same.  (A.R. 212.)  At a follow-up in February 2007, Plaintiff's sister
9    explained that he remained depressed and observed partial compliance with his medications.
10   (A.R. 211.)  Plaintiff tried to minimize his sister's claims, stating that he feels normal but
11   admitting that he has good and bad days.  (A.R. 211.)

12           In March 2007, Dr. Bucardo examined Plaintiff for the purpose of filing out an INS
13   form and for welfare.  (A.R. 208-10.)  Dr. Bucardo noted that Plaintiff was unable to work, that
14   his disability was not permanent if Plaintiff followed the prescribed treatment, that Plaintiff was
15   able to care for himself and was cooperating with the medical treatment.  (A.R. 210.)  Several
16   weeks later, Dr. Bucardo gave Plaintiff the Folstein mini-mental status exam for INS reporting
17   purposes.  (A.R. 208.)  Dr. Bucardo concluded that Plaintiff's symptoms (i.e. depression,
18   paranoia, and agitation), previous medical records, and the exam results showed that Plaintiff's
19   impairment rendered him unable to learn in Spanish or in English.  (A.R. 208.)  Furthermore, on a
20   document titled "Psychiatric Review Form," which appears to be signed by Dr. Bucardo on April
21   12, 2007 but has several indications of being a forged document fraudulently submitted as part of
22   the administrative record, Plaintiff's diagnosis was listed as schizophrenia, paranoid type, his
23   highest global assessment of functioning was 37, and he would experience four or more repeated
24   episodes of decompensation, each of extended duration.  (A.R. 215-18.)
25           2. Evaluating Physicians for Benefits Purposes
26              a. Dr. Rodriguez's Psychiatric Consultative Evaluation
27           Dr. Romualdo Rodriguez performed a complete psychiatric evaluation of Plaintiff on
28   March 12, 2006 at the request of the Department of Social Security.  (A.R. 146.)  Dr. Rodriguez

| | |
|---:|---|
| 1 | noted that Plaintiff "was probably using" Haldol and Vistaril regularly but not Ativan. (A.R. 147.) |
| 2 | Plaintiff reported that he has been having a problem with hearing voices since the age of 26, but |
| 3 | he "constantly stayed vague and nonspecific and was noncommittal." (A.R. 146-48.) Dr. |
| 4 | Rodriguez noted that Plaintiff made good eye contact and had "good interpersonal contact." (A.R. |
| 5 | 149.) Plaintiff explained that he last worked four years ago as a dishwasher and stopped working |
| 6 | because "I felt bad." (A.R. 151.) Since then, Plaintiff helped his sister in the kitchen, ran errands, |
| 7 | and helped with the gardening. (A.R. 151.) Dr. Rodriguez found "no impressive abnormalities on |
| 8 | mental status examination." (A.R. 151.) Dr. Rodriguez determined that Plaintiff was basically |
| 9 | stable, had no functional limitations from a psychiatric standpoint, and was "probably capable of |
| 10 | independently managing funds in an appropriate manner." (A.R. 152.) |
| 11 |       b. Non-examining Consultants for Social Security |
| 12 | Non-examining Social Security Administration consultants Dr. Robert Paxton con- |
| 13 | cluded that Plaintiff had no medically determinable impairment. (A.R. 153-168.) The opinion |
| 14 | was based on one-time consultative examination of non-treating physician Dr. Romualdo |
| 15 | Rodriguez. |
| 16 |     3. Function Reports |
| 17 |       A. Reports by Plaintiff's Sister |
| 18 | Flerida Hernandez, Plaintiff's sister, provided written statements set forth in three third- |
| 19 | party function reports solicited by the Social Security Administration. (A.R. 71-91.) On |
| 20 | December 19, 2005, she wrote that Plaintiff used to be an active person a year ago but he now |
| 21 | slept during the day, avoided social contact with others, and had no desire to work or care for his |
| 22 | family. (A.R. 71-78.) On June 6, 2006, she noted that Plaintiff felt like dying. (A.R. 85.) |
| 23 |       B. Plaintiff's Report |
| 24 | On December 19, 2005, Plaintiff submitted a form describing his day-to-day habits and |
| 25 | feelings. (A.R. 87-94.) He wrote that he sits and watches television most of the day, that he is |
| 26 | depressed, and that he sleeps over 14 hours. (A.R. 87-94.) |
| 27 |       B. Administrative Hearing |
| 28 |       1. Plaintiff's Testimony |

Before Judge Godfrey, Plaintiff testified regarding his medical condition and consequent limitations. (A.R. 229-237; 243-47; 249.) Plaintiff testified that he was unable to work because he hears voices and was paranoid. (A.R. 229-30.) He explained that the voices would tell him to kill himself and that he was worthless. (A.R. 230.) He also testified, "[W]hen I go on the street, I feel everybody's looking at me, that somebody, that everybody wants to harm me." (A.R. 229.) Plaintiff testified that he spends the majority of his time inside. (A.R. 229.) He testified that he separated from his wife and kids, who are living in Mexico, because of his illness. (A.R. 231-32.) He was attempting to obtain U.S. citizenship for himself and his wife and children, and he hired an attorney to do so. (A.R. 236-39.) Plaintiff spent most of time period under his sister's care; she would apportion out his medication daily and feed him once a day. (A.R. 245.) He testified that he would kill himself if he had to live on his own and care for himself. (A.R. 244.)

2. Plaintiff's Sister's Testimony

Flerida Hernandez, sister and cohabitant of Plaintiff, also testified at the April 2007 hearing. (A.R. 237-243.) Ms. Hernandez testified that Plaintiff sometimes would lock himself in his room, would be afraid to come out, would sleep during the day, would barely eat, would have to be told to clean himself or do his chores, and was only partially compliant with his doctor's prescriptions. (A.R. 242-43.) Ms. Hernandez also explained that Plaintiff went over to Mexico by himself back in 2006. (A.R. 240.) When he was there, he overdosed on his medication and went to an emergency room to see his physician in Mexico. (A.R. 240.) The Mexican doctor told him he had to take the medication that was prescribed to him in Mexico and not the ones he was prescribed in the United States. (A.R. 240.) Plaintiff's sister explained that when he returned to the United States, she took him to the psychiatrist, who advised Plaintiff not to go to Mexico in the future and revised the prescription for his psychosis. (A.R. 240.) She also testified that she tried to assist her brother's wife and kids to come to the United States to care for Plaintiff, to no avail. (A.R. 238-39.)

3. Medical Expert's Testimony

At the hearing, medical expert Sidney Bolter, M.D., noted the inconsistencies present in

1   the psychiatric review form signed by Dr. Bucardo and speculated that at least some parts of the
2   document were forged. (A.R. 250-51.) Dr. Bolter pointed out many of the symptoms noted on the
3   form, including a diagnosis of schizophrenia, did not match up with Plaintiff's symptoms as
4   described in previous medical records. (A.R. 252.) He noted that on February 9, 2007, Plaintiff
5   said he felt normal, had no symptoms of paranoia, and minimized his sister's claims, but later said
6   that he had good and bad days, with occasional auditory hallucinations and paranoid ideation.
7   (A.R. 252-53.) He pointed out the partial compliance with the treatment medication as well as his
8   drug seeking behavior, particularly with the addictive drug Ativan. (A.R. 255-57, 263-65.) Dr.
9   Bolter acknowledged that Plaintiff has some psychotic symptoms, but believed that he would be
10  considerably better if he fully complied with his medications. (A.R. 257-59.) Although Dr.
11  Bolter said that his social functioning was markedly impaired, he concluded that he could work
12  with minimal contact with peers and supervisors. (A.R. 259-60.) He testified, "I don't think that
13  he just always locks himself in his room. There's something wrong with that whole story. The
14  concentration, persistence, and pace would be mild for very simple, repetitive tasks." (A.R. 260.)
15  He speculated that he would have minimal (one to two) episodes of decompensation. (A.R. 262.)

16            4. Vocational Expert's Testimony

17            Mark Remas appeared and testified as a vocational expert (VE) at the hearing. (A.R.
18  273-77.) He responded to four hypothetical questions. First, the VE testified that an individual
19  limited to non-public simple, repetitive, unskilled tasks would be able to do work as a hand
20  packager, laundry folder, or harvest worker, but not a gardener. (A.R. 274.) Second, the VE
21  testified that Plaintiff would not be able to sustain work if he were to miss more than three days
22  per month. (A.R. 276.) Third, the VE testified that if Plaintiff had to lay down for five hours
23  during the day, he could not sustain work. (A.R. 276.) Fourth, he opined that if Plaintiff were to
24  miss one, two-week, unscheduled period of work without notice, he would most likely be
25  terminated. (A.R. 277.)

26  **III. THE ALJ DECISION**

27            A hearing before ALJ Godfrey was conducted on April 24, 2007. (A.R. 13.) Plaintiff,
28  his sister Flerida Hernandez, medical expert Dr. Sidney Bolter, and vocational expert Mark Remas

each made an appearance and testified. (A.R. 13-23.) After considering the record, the ALJ found that Plaintiff had the severe impairment of psychosis, not otherwise specified, but that it did not meet or equal the severity of any impairment listed at 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, 416.926). (A.R. 15-16.) The ALJ found that in activities of daily living Plaintiff had moderate restriction; in social functioning Plaintiff had marked difficulties; with regard to concentration, persistence, or pace, the claimant had mild difficulties; and as for episodes of decompensation, Plaintiff had experienced one or two episodes of decompensation and not repeated episodes as defined in the Social Security regulations. (A.R. 15-16.)

The ALJ noted Plaintiff's sister testimony that Plaintiff was only partially compliant with his medication, was isolating himself, had been unable to obtain a job, and was paranoid. (A.R. 21.) The ALJ found that Plaintiff's beliefs regarding his limitations were not totally credible because of his drug-seeking behavior, noncompliance with medication and treatment regimens, conflicting and inconsistent testimonies, inconsistent presentations on psychiatric examinations, and motivation to obtain United States citizenship for himself and his wife and children. (A.R. 17-22.) For these same reasons, the ALJ disregarded results from a mini-mental status exam performed on March 22, 2007 as well as a psychiatric review form dated April 12, 2007, which showed that Plaintiff had schizophrenia, had a global functioning score of 37, and would experience four or more episodes of decompensation, each of extended duration. (A.R. 21.) Additionally, the ALJ noted that at least a portion of the psychiatric review form was forged. (A.R. 21.)

Based on the testimony of the medical expert Dr. Bolter and the vocational expert Mark Remas, the ALJ concluded that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but would be limited to simple repetitive tasks involving minimum contact with others and no public contact. (A.R. 16.) Considering the claimant's age, education, work experience, and residual functional capacity, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (A.R. 22-23.) Thus, Plaintiff had not been under a disability, as defined in the Social Security Act, between November 28, 2005 and October 30, 2007. (A.R. 23.)

///

## IV. STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show that: (1) He suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C.A. § 423 (d)(1)(A), (2)(A) (West 2004). An applicant must meet both requirements to be "disabled." Id.

### A. Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work she has done in the past. If so, the claimant is not disabled. If not, the evaluation proceeds to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 CFR § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

### B. Judicial Review

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223

F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008) (quoting Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Id. (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). This matter may also be remanded to the Social Security Administration for further proceedings. Id. Furthermore, "[a] decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

## V. DISCUSSION

### A. The ALJ Sufficiently Considered the Testimony of Plaintiff's Sister

Plaintiff first contends that the ALJ committed legal error by not considering Flerida Hernandez's testimony concerning Plaintiff's ability to work. (Doc. 12-2, at 15.) Ms. Hernandez provided live testimony at the April 24, 2007 hearing and written statements set forth in two third-party function reports solicited by the Social Security Administration. (A.R. 71-91, 237-243.) Defendant argues that the ALJ did not ignore Ms. Hernandez's testimony and written statements but considered them for the limited probative value and addressed them adequately in her written opinion. (Doc. 15-2, at 4.)

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006). An ALJ must give reasons for discounting this type of evidence and cannot disregard it without comment. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).

If the ALJ intends to disregard such testimony, then he must give reasons germane to each witness for doing so. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). "However, in interpreting the evidence and developing the record, the ALJ does not need to "discuss every piece of evidence," only that which is significant and probative. Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); see also Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

      Here, Plaintiff's sister, Ms. Hernandez, testified that Plaintiff would lock himself in his room, was occasionally paranoid, would sleep during the day, would barely eat, would clean himself or do his chores only when told, would overdose on certain medications, and was not fully compliant in taking all of the medication prescribed. In her opinion, the ALJ did not refer to all of the statements made by Ms. Hernandez but did consider those significant and probative: that Plaintiff was only partially compliant with medication; that he isolated himself; that he was unable to obtain a job; and that he was paranoid. (A.R. 21.) Although the ALJ did not question the credibility of Ms. Hernandez's statements,[1] she did use evidence provided by Ms. Hernandez – namely Plaintiff's paranoia, his noncompliance with medication and treatment regimens, and his inability to obtain a job – to bolster her finding that Plaintiff was not disabled because he could have had the ability to work had he properly and consistently taken his medications. See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) (finding that impairments that can be effectively controlled with medication are not disabling for purposes of determining eligibility for Social Security benefits). Thus, the ALJ did not commit legal error as she properly considered those statements made by Ms. Hernandez that were significant and probative to deciding Plaintiff's case.

    B. The ALJ Sufficiently Considered the Medical and Vocational Experts' Testimonies

      Plaintiff next contends that the ALJ did not consider testimonies given by the vocational expert and the medical expert allegedly showing that Plaintiff is disabled because he is unable to work on a sustained basis due to future episodes of decompensation lasting two weeks

---

[1] The Plaintiff argues in his response to the Motion for Summary Judgment (Doc. 19, at 2) that the ALJ should have recited specific reasons for finding this witness credible or not credible, but he fails to cite to a specific case where this can be construed as a legal error. Even if it were legal error to not make specific findings on credibility, the error would be harmless as the ALJ did accept at face value this witness's testimony.

1 or more. (Doc. 12-2, at 18.) Defendants argue that the ALJ did not find that Plaintiff was likely
2 to experience episodes of decompensation in the future and did not have to accept the vocational
3 expert's hypothetical testimony. (Doc. 15-2, at 5.)

4 To make his argument that he is disabled, Plaintiff relies on the testimony of the
5 medical expert Dr. Bolter, who testified that Plaintiff would experience one or two episodes of
6 decompensation (Doc. 12-2, at 18-19; see A.R. 262.) Plaintiff also relies on the testimony of the
7 vocational expert Mark Remas, who hypothesized that Plaintiff would be unable to retain a job if
8 he were to miss one two-week unscheduled period of work. (Doc. 12-2, at 18-19; see A.R. 277.)
9 Plaintiff completes his argument that he is unable to work for a sustained period of time by
10 defining "episodes of decompensation" as lasting for "at least two weeks." (Doc. 12-2, at 18.)
11 However, according to the regulations, the time period of an episode of decompensation[2] is not
12 defined; more specifically, they are of "temporary" duration that would require "increased
13 treatment or a less stressful situation (or a combination of the two)." 20 CFR 404, Subpt. P, App.
14 1. The regulations do define "repeated episodes of decompensation" as "three episodes within 1
15 year . . . each [episode] lasting for at least 2 weeks." Id. But Plaintiff is not correct in saying that
16 Dr. Bolter testified that Plaintiff would experience one to two episodes of decompensation, each
17 lasting two weeks or more. The record shows that Dr. Bolter said that Plaintiff would experience
18 minimal decompensation, one to two episodes, but did not specify the length of time for each
19 episode. (A.R. 262.) Moreover, the record shows that the vocational expert only hypothesized
20 that if Plaintiff were absent from a job without notice for two weeks, he would most likely be
21 terminated for cause for failing to give notice. (A.R. 277.) Nowhere in the record does the
22 vocational expert testify that Plaintiff would experience repeated episodes of decompensation
23 lasting two weeks or more and thus would be unable to sustain a job. Thus, the Court finds that

---

[2] The Social Security regulations define "episodes of decompensation" as follows:

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).

20 CFR 404, Subpt. P, App. 1.

the ALJ was justified in concluding that Plaintiff would not suffer repeated episodes of decompensation, properly considered the vocational and medical experts' testimony, and did not commit reversible legal error as Plaintiff alleges.

### C. The ALJ Provided Valid Reasons for Rejecting Treating Physician's Opinion

Plaintiff next claims that the ALJ failed to provide specific and legitimate reasons based on substantial evidence in the record for rejecting Dr. Bucardo's opinions set forth on a mini-mental status exam performed on March 22, 2007 as well as a psychiatric review form dated April 12, 2007, which showed that Plaintiff had schizophrenia, a global functioning score of 37, and would experience four or more repeated episodes of decompensation, each of extended duration. (Doc. 12-2, at 19-21.) Defendants contend that the ALJ properly rejected information contained in forms signed by Dr. Bucardo because they were inconsistent with his treatment notes and other medical evidence of record. (Doc. 18, at 6.)

"Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians." Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). To reject a treating physician's opinion, an ALJ must make "'specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" Id. (quoting Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)). For example, an ALJ can disregard a treating physician's diagnosis as untrustworthy when it was obtained for advocative purposes, when it varies from the treating physician's previous treatment notes, or when it is worded ambiguously in an apparent attempt to assist the claimant in obtaining Social Security benefits. Saelee v. Chater, 94 F3.d 520, 522 (9th Cir. 1996).

Here, the ALJ did not outright reject the opinions of the treating physician Dr. Bucardo; rather, the ALJ provided specific and legitimate reasons for disregarding opinions contained in two forms supposedly filled out by Dr. Bucardo: the psychiatric review form dated April 12, 2007 and the results of the mental status examination dated March 22, 2007. (See A.R. 19-21.)

First, the ALJ noted that pertinent progress notes dated March 22, 2007 reflected that Plaintiff was given the mental status examination for the purpose of supportive documentation for

immigration reporting and for applying for citizenship. (A.R. 21; see A.R. 208-10.) The ALJ was justified in concluding that the results of the exam were untrustworthy because it was obtained for advocative purposes. See Saelee, 94 F.3d at 522.

Second, the ALJ noted that Dr. Bucardo's treatment notes from January 5, 2006 through March 15, 2007 provided little or no support for the opinions expressed in either the mental status examination dated March 22, 2007 or the psychiatric review form dated April 12, 2007, which concluded that Plaintiff had schizophrenia and had a global functioning score of 37. (A.R. 21.) For example, in January 2006 according to Dr. Bucardo, Plaintiff was intact with reality, had no hallucinations or delusions, had a global functioning score of 55, and was given medication for a psychosis not otherwise specified. (A.R. 186.) In February 2006, Plaintiff exhibited drug-seeking behavior according to psychiatrist Dr. Renzi. (A.R. 135.) In August 2006, Plaintiff reported to Dr. Bucardo improvement in mood and thought, was not reclusive or isolating, and denied paranoia or flashbacks. (A.R. 171.) Dr. Bucardo noted that Plaintiff was less guarded but had poor eye contact, and his speech was soft with increased latency but clear and coherent. (A.R. 171.) In December 2006, after taking a trip to Sinaloa where his medications were altered by a Mexican doctor, Plaintiff started hearing voices; however, Dr. Conte, the examining physician at the psychiatric hospital in San Diego, found no functional limitations from a psychiatric standpoint. (A.R. 204.) That same month, Dr. Bucardo noted that Plaintiff was not fully complying with the treatment prescribed by him and told him to take the medications prescribed by him regularly. (A.R. 212.) At a follow-up in February 2007, Plaintiff's sister explained that he remained depressed and observed partial compliance with his medications. (A.R. 211.) Plaintiff tried to minimize his sister's claims, stating that he feels normal but admitting that he has good and bad days. (A.R. 211.) On March 15, 2007, Dr. Bucardo wrote that Plaintiff's disability was not permanent and that he may recover his ability to participate in vocational rehabilitation. (A.R. 210.) As concluded by the ALJ, all these statements did not comport with the diagnosis of schizophrenia and the low global functioning score that appeared for the first time in the psychiatric review form and the mini-mental status examination results in the spring of 2007.

Third, the ALJ noted that it was questionable whether the psychiatric review form was

1  actually signed by Dr. Bucardo and that few of the comments on the form were made by him.[3]
2  (A.R. 21.) The ambiguity and indications of fraud evidenced in the document were another
3  legitimate reason for the ALJ to reject it outright.
4      In sum, the ALJ properly rejected a portion of Dr. Bucardo's opinion with specific and
5  legitimate reasons for doing so based on substantial evidence in the record.
6      D.  The ALJ's Decision Is Supported by Substantial Evidence
7      Plaintiff finally argues that the ALJ's decision is not supported by substantial evidence
8  because it ignores the treating physician's opinion, competent lay testimony, and probative
9  vocational expert testimony. (Doc. 12-2, at 23.) Plaintiff contends that the ALJ instead adopted
10 the opinion of the medical expert Dr. Bolter without considering pertinent evidence in the record.
11 (Id.) Defendant argues that the ALJ properly adopted the opinion of Dr. Bolter and made her
12 conclusions based on substantial evidence in the record. (Doc. 18, at 7.)
13     The Court finds that the ALJ properly relied on the testimony of Dr. Bolter, who
14 testified that Plaintiff was mentally capable of performing simple repetitive tasks with no public
15 contact and minimal contact with other workers and could function even better than that if he
16 properly took his medications. (A.R. 18, 260.) As shown above, the Court finds that the ALJ
17 properly considered and used the testimony of Plaintiff's sister Flerida Hernandez; sufficiently
18 considered the testimonies of the medical and vocational experts; provided valid reasons for
19 rejecting a portion of Dr. Bucardo's opinions; and made her ultimate conclusion that Plaintiff was
20 not disabled under the Social Security Act based on substantial evidence in the record.
21 **VI. CONCLUSION**
22     For the reasons set forth above, Plaintiff's Motion for Summary Judgment should be
23 DENIED, Defendant's Cross-Motion for Summary Judgment should be GRANTED, and the
24 decision of the ALJ should be affirmed.
25     This report and recommendation is submitted to the Honorable William Q. Hayes, the
26 United States District Judge assigned to the case, pursuant to 28 U.S.C. § 636(b)(1). Any party

---

[3] Upon reviewing the form, the undersigned believes that the psychiatric review form is a fraudulent document. It does not appear to be signed and dated by Dr. Bucardo, and there are multiple different handwritings on the document.

1 | may file written objections with the Court and serve a copy on all parties on or before **April 17,**
2 | **2009**.  The document should be captioned "Objections to Report and Recommendation."  Any
3 | reply to the Objections shall be served and filed on or before **April 27, 2009**.  The parties are
4 | advised that failure to file objections within the specific time may waive the right to appeal the
5 | district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
6 |     IT IS SO ORDERED.
7 | DATED: March 26, 2009

                          Peter C. Lewis
                          U.S. Magistrate Judge
                          United States District Court

11 | cc: District Judge Hayes; all parties and counsel of record